1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE:
KEVIN ERWIN FEIGE and MARY
JANETTE FEIGE,

        *Debtors.*

SPOERER / BURKE 1, LLC, a Washington
Limited Liability Company,

        *Appellant, Cross-Appellee,*
  v.

KEVIN ERWIN FEIGE and MARY
JANETTE FEIGE,

        *Appellees, Cross-Appellants.*

District Court No. C04-2539RSM

Bankruptcy Court No. 04-049

Adversary Case No. 03-01533

Bankruptcy No. 03-19874

MEMORANDUM ORDER
AFFIRMING IN PART AND
REVERSING IN PART ORDER
GRANTING DEBTOR'S MOTION
FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

      This matter comes before the Court on appeal from a grant of summary judgment

entered by the Honorable Samuel J. Steiner, United States Bankruptcy Judge, in the Bankruptcy

Court of the Western District of Washington.  (Dkt. #12).

      The appeal is from an Adversary action in which appellant/cross-appellee (Spoerer)

sought to either deny discharge of appellees/cross-appellants' (Feiges) debt under 11 U.S.C.

ORDER
PAGE - 1

§ 727, or except from discharge Feiges' debt to Spoerer under 11 U.S.C. § 523.  Judge Steiner granted Feiges' motion for summary judgment, dismissing all of Spoerer's claims, and granted $7,500 in sanctions against Spoerer and Spoerer's counsel.  (Dkt. #1, Attachments 5-8).  Judge Steiner declined, however, to award sanctions against Charles Spoerer and his marital community as the real party in interest.  (Dkt. #1, Attachment 8 at 9).

On appeal, Spoerer asks this court to address three issues:[1]

1) Should the bankruptcy court have dismissed on summary judgement all of Spoerer's claims set forth in its Adversary Complaint?

2) Should the bankruptcy court have sanctioned Spoerer and its counsel for bringing its claims?

3) Should this Court remand this case to the bankruptcy court for a trial on the merits?

(Dkt. #12 at 7).  In response, the Feiges bring three issues of their own on cross-appeal:

1) Did the bankruptcy court abuse its discretion by awarding only $7,500 in sanctions rather than the $31,000 asked for?

2) Did the bankruptcy court err in refusing to assess fees and costs against Charles Spoerer as the real party in interest?

3) Should attorney fees and costs be awarded to the debtors on appeal pursuant to 28 U.S.C. §1912 and Fed. Rule of App. P. 38?

(Dkt. #13 at 17-18).  Following submission of Feiges' reply brief, Spoerer filed a motion to strike a portion of that brief and the supporting documents attached to Feiges' counsel's declaration.  (Dkt. #20).  This resulted in yet another response and reply.  (*See* Dkt. #21, 22).

The Court has reviewed the parties' briefing, the bankruptcy record, and the remainder of the record.  For the reasons set forth below, the Court finds that questions of fact remain

---

[1]Spoerer raises, but then fails to argue, a fourth issue regarding whether the bankruptcy court should have issued findings of fact before dismissing all of Spoerer's claims.  (Dkt. #12 at 7).  Fed. R. Civ. P. 52, incorporated by Bankr. R. 7052, states that "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rule . . . 56."  *See also Lindsey v. Leavy*, 149 F.2d 899, 902 (9th Cir. 1945) ("Since a summary judgment presupposes that there are no triable issues of fact, findings of fact and conclusions of law are not required in rendering judgment, although the court may make such findings with or without request.").

ORDER
PAGE - 2

1    regarding the specific claims identified below.  The Order granting summary judgment to the

2    Feiges is AFFIRMED IN PART and REVERSED IN PART.  This matter will be REMANDED,

3    and the Bankruptcy Court will be directed to conduct a trial on the merits of those specific

4    claims.  Additionally, the Order awarding sanctions against Spoerer is VACATED and

5    REMANDED; costs and fees on appeal are DENIED; and Spoerer's motion to strike is

6    DENIED without prejudice.

7                           **II.  JURISDICTION / STANDARD OF REVIEW**

8            This Court has jurisdiction on appeal pursuant to 28 U.S.C. § 158(a)(1) and (c)(1)(A).

9    At the time Spoerer announced its intent to appeal the underlying bankruptcy order, it elected to

10   have the appeal heard in this Court, rather than by the Bankruptcy Appellate Panel.

11           An order by the bankruptcy court granting summary judgment is reviewed *de novo*.  *In*

12   *re Shafer*, 294 B.R. 126, 129 (N.D.Cal. 2003).  "Findings of fact made in summary judgment

13   proceedings are not entitled to the 'clearly erroneous' standard of review because the trial court

14   has not weighed the evidence in the conventional sense."  *Id.  See also Heiniger v. Phoenix*, 625

15   F.2d 842, 843-844 (9th Cir. 1980).  Thus, viewing all reasonable inferences in favor of the non-

16   moving party, this Court must determine whether "the pleadings, depositions, answers to

17   interrogatories, and admissions on file, together with the affidavits, if any, show[ed] that there

18   [was] no genuine issue as to any material fact and that the moving party [was] entitled to

19   judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

20   242, 247 (1986).

21                                   **III.  DISCUSSION**

22   **A.  Background**

23           On June 30, 2001, debtors Kevin and Mary Feige entered into a two-year Lease/Rental

24   agreement with creditor Spoerer on a new home in Kirkland.  The parties also executed an

25   Option to Buy the property and a Purchase and Sale Agreement to take effect if and when the

26

ORDER
PAGE - 3

option was exercised.  Spoerer's position is that Kevin Feige represented that he had enough liquid Microsoft stock options that he could pay cash for the house outright, and that is why Spoerer accepted the Feiges for the Lease/Option/Purchase.  (Dkt. #12 at 9).  Additionally, while Charles Spoerer knew Mary Feige operated a pet sitting business, Kritter Konnection, he claims the Feiges represented that they did not own pets and would not have pets in the house. He states that they would not have been accepted as renters had he known they owned cats. (Dkt. #12 at 9).  The lease agreement forbids pets without prior written consent by the landlord and a fully executed Pet Agreement.  (CP 47, Ex. G at 2).[2]

The Feiges' position is that upon signing the Lease/Option/Purchase agreement, the house had not been completed or sufficiently cleaned of construction debris, but that Spoerer assured them that the house would be completed before they moved in.  (Dkt. #13 at 6).  They further contend that repairs were not completed to their satisfaction, so in an attempt to compel Spoerer to complete the work, the Feiges began withholding rent, ceasing to pay any rent at all beginning in November 2001.

Following two Notices to Pay Rent or Quit, Spoerer filed an unlawful detainer action in King County Superior Court.  The Feiges surrendered the premises on May 15, 2002, and the unlawful detainer action was sent to arbitration for damages and attorney fees on the contract. According to Spoerer, the Feiges left the house in poor condition, having drilled holes in the cabinets; poured paint on the garage floor; rigged the toilet with dishwashing detergent so it would foam over when flushed; and left the carpet covered with pet stains and dirt.  (Dkt. #12 at 11).

In December 2002, the arbitrator awarded Spoerer $15,960 in back rent and late fees plus $29,224.22 in attorney fees and costs for a total award of $45,184.22.  The Feiges then

---

[2]Citations to the record are designated as Docket Numbers (Dkt #) for materials that appear on the district court's docket and Clerks Papers (CP) for materials found on the bankruptcy court's docket at 03-01533-SJS.

ORDER
PAGE - 4

1    requested a Trial De Novo, which was held in March 2003 before Judge Erlick in King County

2    Superior Court.  Judge Erlick awarded Spoerer a total of $84,911.26, covering unpaid rent and

3    late fees, attorney fees and costs, carpet cleaning, general cleaning, cabinet knob replacement,

4    and unpaid utility bills.

5         On July 31, 2003, the Feiges filed for Chapter 7 bankruptcy protection.  On Schedule B,

6    Feige valued his Microsoft stock options at $949.73.  Schedule I shows Mary Feige's Kritter

7    Konnection business as generating zero income.  At the meeting of creditors, held September 4,

8    2003, pursuant to 11 U.S.C. § 341, Mary Feige stated that Kritter Konnection "will be ending at

9    the end of this month."  (Dkt. #12 at 14).  On November 3, 2003, Spoerer filed its Adversary

10   Complaint seeking denial of or exception from discharge of the Feiges' debt, and on July 9,

11   2004, Judge Steiner granted the Feiges' motion for summary judgment.  At a separate hearing

12   on September 17, 2004, Judge Steiner imposed sanctions on Spoerer and its counsel pursuant to

13   11 U.S.C. § 523(d) and Bankr. R. 9011.

14   **B.  Analysis**

15        In order to effectuate the fresh start policy of the bankruptcy code, exceptions to

16   discharge are to be construed strictly against the creditor and liberally in favor of the debtor.  *In*

17   *re Riso*, 978 F.2d 1151, 1154 (9th Cir. 1992).  However, "the relief of a bankruptcy discharge is

18   not an absolute right, but rather, a privilege accorded to honest debtors who conduct their

19   financial affairs with honesty and openness, and otherwise satisfy the Bankruptcy Code's

20   statutory obligations."  *In re Ogalin*, 303 B.R. 552, 557 (Bankr. D. Conn. 2004).  For the

21   reasons set forth below, all Spoerer's § 523 claims fail and summary judgment on those is

22   affirmed.  Some questions of fact remain, however, regarding most of the § 727 claims and

23   therefore those claims are remanded to the bankruptcy court for a trial on the merits.

24        **1.  Claims Under 11 U.S.C. § 523**

25             a. § 523(a)(2)(A): Misrepresentation/Fraud

26

ORDER
PAGE - 5

1    Spoerer seeks to exempt the Feiges' debt from discharge under 11 U.S.C. §

2    523(a)(2)(A), claiming the Feiges misrepresented the value of Microsoft stock options and

3    whether they had cats.  Section 523(a)(2)(A) excepts from discharge debts for money or

4    property obtained through "false pretenses, a false representation, or actual fraud."  Charles

5    Spoerer claims he relied on the representations made by the Feiges that they had stock options

6    sufficient to purchase the house outright when he entered into the lease/option/purchase

7    agreement.  (Dkt. #12 at 35).  Further, he states that he would never have rented the house to

8    them if he knew that they had cats.  (CP 48, ¶ 24).

9                          i.  Possession of Cats

10    The bankruptcy judge dismissed the complaint regarding cats finding that even if Spoerer

11    could prove the allegations, it merely amounted to breach of the lease, "that is, [they] committed

12    a breach of contract, which is certainly dischargeable."  (Dkt. #1, attachment #6 at 4).

13    However, entering into a contract with the intent not to comply with its terms and later

14    defaulting under that contract may provide a basis for exception to discharge on the grounds of

15    fraud if the other remaining elements are satisfied.  *In re Faulk*, 69 B.R. 743, 750 (Bankr. D.

16    Ind. 1986) (citing *In re Taylor*, 49 B.R. 849, 851 (Bankr.E.D.Pa.1985)).  If Spoerer's

17    allegations are true, it would appear that the Feiges intended at the formation of the contract not

18    to comply with the "no pets" provision.

19    To preclude discharge under § 523(a)(2)(A), a plaintiff must show:  (1) that the debtor

20    made representations; (2) that he knew they were false at the time; (3) he made them with the

21    intent to deceive the creditor; (3) the creditor relied on the representations; and (4) the creditor

22    sustained the alleged loss and damage as the proximate result of the representations having been

23    made.  *In re Kirsh*, 973 F.2d 1454, 1457 (9th Cir. 1992).  The first three elements appear to be

24    clearly met.  However, even if fraudulent pet ownership is actionable under § 523(a)(2)(A),

25    Spoerer has failed to satisfy the element of proximate cause.

26

ORDER
PAGE - 6

Spoerer claims that because he would not have rented the house to the Feiges had he known about the cats, such misrepresentation is the proximate cause of the $85,000 in damages. However, the causation element in fraud cases demands more than "but-for" causation. *United States v. Spicer*, 57 F.3d 1152, 1157 (D.C. Cir. 1995).  A causal relationship must be established between the misrepresentation and the loss suffered. *In re Dixie-Shamrock Oil & Gas, Inc.*, 53 B.R. 262, 267 (Bankr. D. Tenn. 1985).  The damages must "foreseeably be expected to follow from the character of the misrepresentation itself. . . .  It is only where the fact misstated was of a nature calculated to bring about such a result that damages for it can be recovered." *Id.* (quoting PROSSER, HANDBOOK OF THE LAW OF TORTS at 732 (4th ed. 1971)).  Here, the overwhelming majority of the judgment is for unpaid rent and attorney's fees.  Although the Feiges' misrepresentation may have induced Spoerer to enter into the lease, there is no connection alleged between lying about cats and failure to pay the rent, nor is the withholding of rent a foreseeable result of owning pets or lying about owning pets.

While Spoerer could potentially argue that the $750 awarded for carpet cleaning should be excepted from discharge, it fails to do so, instead claiming the entire $85,000 debt was proximately caused by the Feiges owning cats. (Dkt. #17 at 15).  In fact, Spoerer appears to consider remand to the bankruptcy court an opportunity to show damages in addition to what have already been claimed. (Dkt. #17 at 21).  While any additional damages not covered by the superior court judgment may have constituted a valid claim, the time to assert those would have been when filing a proof of claim. *See* Bankr. R. 3001, 3002.

ii.  Value of Microsoft Stock Options

The bankruptcy judge refused to consider the claim regarding misrepresentation of stock options stating that "Spoerer is now trying to expand this claim beyond the allegations concerning the pets and trying to do so without amending the complaint." (Dkt. #1, attachment #6 at 4).  In its initial pleading, Spoerer's § 523(a)(2)(A) claim makes no mention whatsoever of

1    the stock options, their alleged value, or any representations made about them.  (CP 1 at 9).

2    Spoerer claims, however, that it did not learn that the stock options were probably valueless as

3    of June 2001 until it was too late to amend its complaint.  (Dkt. #12 at 33-34).

4            While § 523(a)(2)(A) excepts from discharge claims arising from "false pretenses, a false

5    representation, or actual fraud," it expressly excludes from its coverage "a statement respecting

6    the debtor's or an insider's financial condition."  This is instead covered by § 523(a)(2)(B),

7    which contains its own criteria including a requirement that the statement be in writing and that

8    the creditor reasonably relied on such writing.

9            Courts disagree on whether "statements respecting the debtor's financial condition" for

10   the purposes of § 523(a)(2) should be construed broadly, encompassing any statement relating

11   to some portion of the debtor's finances, or narrowly, limiting subsection (B) to statements

12   about a debtor's net worth or earning capacity, "the so-called false financial statement."  *See In*

13   *re Medley*, 214 B.R. 607, 611-12 (9th Cir. BAP 1997) (discussing the two approaches but not

14   adopting one).  A statement that a debtor has a an amount of liquid stock options sufficient to

15   pay cash for a house outright is for all practical purposes a representation of net worth and

16   concerns his financial condition under either approach.  This claim is therefore properly dealt

17   with under § 523(a)(2)(B).[3]

18           Spoerer does not allege that Feige made his representations in writing.  In fact, the

19   declaration of Charles Spoerer shows only oral statements.  (*See* CP 48, ¶ 5) ("he said he had

20   significant stock options"; "I was told by Kevin that the value of his Microsoft stock options

21   was significant"; "he said that if he wanted to, he could cash in his options so that they could pay

22   almost cash for the house").  The only thing that could arguably be a written representation is

23   _____

24           [3]Moreover, in *In re Mercado*, 144 B.R. 879 (Bankr. C.D.Cal. 1992), arguably the case within
     the Ninth Circuit most critical of the "broad construction," the court distinguished cases in which
25   the overall financial condition of the debtor was extremely relevant to the lender.  "In that circumstance, a
     misrepresentation regarding a material asset that would effect the evaluation of the overall financial
26   condition of the debtor certainly fits within the parameters of § 523(a)(2)(B).  *Id.* at 884.

ORDER
PAGE - 8

boilerplate language on page 2 of the Purchase and Sale Agreement that states: "Buyer represents that Buyer has sufficient funds to close this sale in accordance with this Agreement and is not relying on any contingent source of funds or gifts, except to the extent otherwise specified in this Agreement." (CP 47, Ex. G at 8). Notwithstanding that the Purchase and Sale Agreement has no force or effect until exercise of the option, any reliance on such boilerplate language as a representation of the value of Feige's stock options is unreasonable.

Spoerer attempts to bolster its argument by showing that Feige made similar representations, including comprehensive documentation, to Joseph Congelli in September 2002, when he applied for a loan to purchase a house in Duvall, Washington. (Dkt. #12 at 33). This information is irrelevant to Spoerer's § 523(a)(2) claim. Even if the representations were in writing and false in that instance, Spoerer could not possibly have relied on them during the June 2001 transaction. Therefore, even had Spoerer properly pled this claim, with particularity and under the correct subsection of the statute, it fails due to lack of a writing and was properly dismissed.

### b. § 523 (a)(2)(C): Loading up on Luxuries

Spoerer claims a presumption of fraud on the basis of 11 U.S.C. § 523 (a)(2)(C). This section provided (as of the time of filing) that "for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $ 1,225 for 'luxury goods or services' incurred by an individual debtor on or within 60 days before the order for relief under this title . . . are presumed to be nondischargeable." Spoerer argues that the debt generates from the Superior Court judgment as well as the lease, option, and purchase agreements and that financial damages continue to accrue and therefore, the debt was incurred within 60 days of filing. (Dkt. #12 at 38-39). Spoerer also claims that the Kirkland house is a "luxury item." (Dkt. #12 at 39).

Despite the bankruptcy judge's characterization of this claim as "really preposterous"

1   (Dkt. #1, Attachment #6 at 4), and explanation that the purpose of the exception is to "prevent

2   debtors from discharging debts incurred on credit cards for luxury goods or services on the eve

3   of bankruptcy," (Dkt. #1, Attachment #6 at 4-5), Spoerer continues to pursue this claim on

4   appeal.

5        This claim fails because the debt to Spoerer was incurred more than 60 days before

6   filing.  The Feiges' filed their Chapter 7 petition on July 7, 2003.  (Dkt. #13 at 6).  The

7   lease/option/purchase agreement was signed June 30, 2001.  (CP 47, Ex G).  The Feiges began

8   withholding rent in November 2001.  (CP 1, Ex. E at 5).  On May 15, 2002, they turned over

9   their keys, terminating possession.  (CP 1, Ex. E at 7).  The Superior Court judge, however,

10  held the Feiges accountable for rent through February 28, 2003.  (CP 1, Ex. E at 16).  Not one

11  of these dates supports a presumption of nondischargeability under § 523 (a)(2)(C) by falling

12  within the 60 day time period before filing.  Spoerer's attempt to manipulate the timeline by

13  referring to the date of the Superior Court judgment as when the debt was incurred would

14  require that the Feiges owed nothing prior to the court's judgment.  Spoerer offers no support

15  for this interpretation of the statute other than "the Code says what the Code says."  (Dkt. #17

16  at 22).

17       Similarly, Spoerer's argument that its financial damages are still accruing today is

18  without merit.  (See Dkt. #12 at 39).  The Feiges are not currently receiving consumer goods or

19  services from Spoerer, and likewise, the contractual attorney fees awarded by the Superior

20  Court are not consumer debt.  *See* 11 U.S.C. § 101.  Because the Feiges did not incur consumer

21  debt within 60 days of filing, the claim fails and therefore, the Court need not consider whether

22  the rental house is a luxury item.

23            c.  § 523 (a)(6):  Willful and Malicious Injury

24       Spoerer's claim to except from discharge the Feiges' debt due to willful and malicious

25  injury fails and summary judgment on that point is affirmed.  Bankruptcy law provides that a

26

1    "discharge under section 727 . . . does not discharge an individual debtor from any debt . . . for

2    willful and malicious injury by the debtor to another entity or to the property of another entity."

3    11 U.S.C. § 523 (a)(6).  To support its position that the Feiges' debt is for willful and malicious

4    injury, Spoerer recites a laundry list of alleged conduct including booby trapping the ice box and

5    toilet, threatening Charles Spoerer in letters and voice messages, dumping paint on the garage

6    floor, and damaging the carpet and kitchen cabinets.  (Dkt. # 12 at 43-44).

7        The debt that Spoerer is seeking to except from discharge is a judgment from an

8    unlawful detainer action in King County Superior Court for $84,911.26.  (Dkt. # 12 at 12).  The

9    majority of this amount is to cover unpaid rent, late fees, and attorney fees and costs.  (Dkt. #13

10   at 6).  $1,151.76, however, was awarded to cover carpet cleaning and parts and labor for new

11   kitchen cabinet hardware.  (Dkt. #13 at 6; Dkt. #1, attachment 5 at 8).

12       The rule in the Ninth Circuit is "that § 523(a)(6)'s willful injury requirement is met only

13   when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is

14   substantially certain to result from his own conduct."  *In re Su*, 290 F.3d 1140, 1142 (9th Cir.

15   2002).  Only debts arising from tortious acts are non-dischargeable under § 523(a)(6).  *In re*

16   *Moultrie*, 51 B.R. 368, 373 (Bankr. D. Wash. 1985).

17       Breach of contract is not the type of injury addressed by § 523(a)(6).  *In re Riso*, 978

18   F.2d 1151, 1152 (9th Cir. 1992).  Spoerer's judgment from the King County Superior Court

19   arises almost entirely from breach of contract.  Unpaid rent, late fees, and attorney fees

20   amounting to $83,759.50 are all the result of Feige's breach of the Lease/Rental Agreement.

21       The only part of the judgment arguably stemming from "willful and malicious" conduct is

22   the $1,151.76 for cleaning and cabinets.  Here, however, Spoerer has failed to raise an issue of

23   fact sufficient to overcome summary judgment.  First, Spoerer's own argument shows that the

24   reason the Feiges drilled holes in the kitchen cabinets was to install their own hardware.  (Dkt.

25   #12 at 37).  This does not even approach the subjective motive to inflict injury required under *In*

26

ORDER
PAGE - 11

*re Su*. Second, other than the conclusory statement that the pet damage was "willful," Spoerer offers nothing to show that the Feiges intentionally caused their cats to stain the carpet with feces and vomit. Instead, Spoerer focuses its argument on the number of cats and that they were not allowed, none of which are relevant to the Feiges' subjective intent. (*See* Dkt. #12 at 43). Finally, Spoerer's allegations of threatening phone messages and letters have no connection to the judgment awarded by the Superior Court.

While Spoerer could potentially link the $300 awarded for general cleaning to the booby-trapped ice box and toilet and paint spilled on the floor, this would result in, at most, non-dischargability of that $300 portion of the judgment. However, Spoerer nowhere claims that the $300 was for these alleged acts, preferring instead to claim a "comprehensive course of conduct" in an attempt to have the entire judgment ruled non-dischargeable under § 523(a)(6). (*See* Dkt. #12 at 45). Accordingly, this claim was properly dismissed.

### 2. Claims Under 11 U.S.C. § 727

Spoerer seeks to deny the Feiges discharge in bankruptcy due to failure to comply with multiple provisions of § 727. Spoerer's objections address the value of Feige's Microsoft stock options and whether the Kritter Konnection business has value or produces income. All but one of these claims will be remanded to the bankruptcy court for trial because genuine issues of material fact remain to be determined.

#### a.  § 727(a)(2)(A): Transfer or concealment of property

"The court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A).

Spoerer has raised a genuine issue of material fact sufficient to defeat summary judgment regarding whether the Feiges have concealed the value of their Microsoft stock options and

ORDER
PAGE - 12

income generated by the Kritter Konnection business. While concealment can be accomplished by a transfer of title coupled with the retention of the benefits of ownership, *In re Reader*, 183 B.R. 630, 634 (Bankr. D.Idaho 1995), or physically hiding assets of the estate which would fund distributions to creditors, *In re Bobroff*, 58 B.R. 950, 952 (Bankr. D. Pa. 1986), it also includes preventing discovery or withholding knowledge or information required by law to be made known. *In re Scott*, 172 F.3d 959, 967 (7th Cir. 1999).

A question remains as to the value of Kevin Feige's stock options during the one year period before he filed bankruptcy and thus, summary judgment was inappropriate. As evidence of the options' previous value, Spoerer offers a declaration by Joseph Congelli, with supporting documents showing that Feige produced materials when applying for a loan that established a value over $328,000. (CP 49). On the other hand, Spoerer also offered a report from his expert witness, Steven Bishop, concluding that the options were worthless not only when the bankruptcy petition was filed, but also when the Congelli loan application was signed.

The bankruptcy judge concluded that Congelli's declaration was insufficient to raise a genuine issue of material fact because Congelli is not an expert witness and did not submit the figures on which he based his valuation. (Dkt. #1, Attachment 6 at 2). However, Bishop's opinion is based on materials submitted by Kevin Feige that appear to be less than complete. (*See* Dkt. #12 at 24; CP 47 at 3-4). While Congelli's valuation may not be enough to conclusively show that the options had value in September 2002, it does present a factual issue to be determined at trial. Whether the Feiges possessed valuable options in September 2002 is material because withholding such knowledge or information could be concealment for the purposes of § 727(a)(2)(A). *See In re Scott*, 172 F.3d at 967.

Similarly, schedule I of the Feiges' bankruptcy petition lists no income from Kritter Konnection. (Dkt. #12 at 13). However, from the materials submitted by the Feiges, Bishop's expert opinion is that the business does have value and produces an income. (CP 47 at 12). The

ORDER
PAGE - 13

1    bankruptcy judge stated that "a dispute regarding the value of the business on the petition date is

2    not tantamount to a transfer or concealment with intent to defraud." (Dkt #1, Attachment 6 at

3    1).  However, if the business does produce an income, an attempt to hide that income could

4    amount to a concealment. *See In re Scott*, 172 F.3d at 967.

5           From the evidence put forth at summary judgment, whether Kritter Konnection produces

6    an income is unclear and therefore summary judgment is inappropriate.  Spoerer should have the

7    opportunity to prove the existence of an income before the trier of fact.  If successful, Spoerer

8    will still have to prove that Feige acted with intent to hinder, delay, or defraud, which may be

9    established by circumstantial evidence, or by inferences drawn from a course of conduct.  *See In*

10   *re Devers*, 759 F.2d 751, 753-54 (9th Cir. 1985).

11               b.  § 727(a)(4)(A), (B): False Oath, Account, or Claim

12          "The court shall grant the debtor a discharge, unless . . . the debtor knowingly and

13   fraudulently, in or in connection with the case . . . made a false oath or account . . . [or]

14   presented or used a false claim."  11 U.S.C. § 727(a)(4)(A), (B).

15          "A material omission from the debtor's Chapter 7 schedules, or a false answer on a

16   statement of financial affairs may constitute a false oath for purposes of § 727."  *In re Martin*,

17   88 B.R. 319, 323 (D. Colo. 1988).  On schedule B of the Voluntary Petition, Feige listed the

18   value of his stock options as $949.73.  Spoerer's expert witness, however, determined based on

19   information provided by Kevin Feige that the options were worthless on the date of filing.  (CP

20   47 at 3).  It is unclear whether the discrepancy is the result of faulty calculations or a failure to

21   disclose sufficient information from which Bishop could correctly determine the value.  Until the

22   actual value of the options is determined, a question of fact remains as to whether Feige's

23   answer on his bankruptcy petition is a false oath.  Similarly, if the Kritter Konnection business is

24   determined to be producing an income, listing the income as $0.00 could be found to be a false

25   oath as well.

26

ORDER
PAGE - 14

Spoerer also claims that Mary Feige's statement at the § 341 meeting of creditors that the business would be shut down at the end of the month is a false statement. (Dkt. #12 at 13-14). While the evidence shows that the business continued to operate beyond that date, (Dkt. #12 at 15), Spoerer still must show that the statement was material and made with intent to defraud. *See In re Martin*, 88 B.R. at 323. *See also In re Hughes*, 184 B.R. 902, 909 (Bankr. D. La. 1995) ("The subject matter of a false oath is 'material' and thus sufficient to deny discharge if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence or disposition of his property.").

Feiges' counsel argues that Mary Feige made the comment because she did not understand that she was not free to do as she wished with the business until the Trustee issued his report of no distribution on October 16, 2003. (Dkt. #13 at 13). However, even after that date, Ms. Feige continued to operate the business. (Dkt. #12 at 15). Considering the Feiges' claims that they have more monthly expenses than income, (CP 94, Ex. B (Summary of Schedules)), and that Kritter Konnection not only provides no income, but loses money, (Dkt. #13 at 9), it is suspicious that they would, or could afford to, continue operation of the business after filing for bankruptcy.   Accordingly, a question of fact remains and summary judgment is inappropriate.

### c.  § 727(a)(5): Failure to Explain Loss or Deficiency of Assets

"The court shall grant the debtor a discharge, unless . . . (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."  11 U.S.C. § 727(a)(5).

"Under this section, the party objecting to discharge has the initial burden of proving substantial and identifiable assets that the debtor owned at a time not too far removed from the bankruptcy that are no longer available for creditors." *In re Devaul*, 318 B.R. 824, 839 (Bankr. D. Ohio 2004).  Questions of fact remain regarding the value of the stock options both in

ORDER
PAGE - 15

September 2002, and on the date of filing, July 31, 2003.  If Congelli's 2002 valuation is determined to be correct, and Feige's or Bishop's 2003 valuations are also determined to be correct, then Feige will have the burden of explaining the loss.  *See In re Brenes*, 261 B.R. 322, 337 (Bankr. D. Conn. 2001) ("Once a plaintiff has established the disappearance of substantial assets, the burden shifts to the debtor to satisfactorily explain the loss or deficiency.").  Accordingly, this issue will be remanded.

### d.  § 727(a)(3): Concealment of or Failure to Keep Records

"The court shall grant the debtor a discharge, unless . . . the debtor has . . . failed to keep or preserve any recorded information . . . from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."  11 U.S.C. § 727(a)(3).

Section 727(a)(3) requires debtors, as a precondition to discharge, to produce records that provide creditors "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present."  *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996).  While it does not impose a rigid standard of perfection, creditors should not be required to speculate as to the financial history or condition of the debtor.  *Id.* at 428.

Regarding the requirement to "keep or preserve any recorded information," "keep" and "preserve" are not synonyms.  *In re Scott*, 172 F.3d at 969.  "Keep" means to maintain a record, as in "to keep a diary."  *Id.*  This prevents the word "preserve" from being superfluous.  *Id.*  "Keep also means to maintain continuously and methodically."  *In re Volpe*, 317 B.R. 684, 690 (Bankr. D.S.C. 2003).  The debtor's records must be kept in a manner that is contemporaneous to the events as they unfold.  *Id.*  Unlike many § 727 claims, intent is not an element of a § 727(a)(3) claim.  *Id.* at 694.

ORDER
PAGE - 16

The records submitted by the Feiges regarding Kritter Konnection are insufficient to enable a reconstruction of their financial transactions. According to Bishop, bank deposits do not equal revenues reported on income tax returns; accounts receivable and accounts payable cannot be ascertained; and disbursements do not reconcile to expenses reported. (CP 47 at 4-12). Additionally, the evidence shows that records were not kept contemporaneously. W-2 forms for Kritter Konnection employees for 2001 were never created; no Washington state Labor and Industries tax returns were prepared until the first quarter of 2004; and no state or local excise tax returns were filed until April 2004. (CP 47 at 4-12).

While the Feiges rely on *Juzwiak* for the proposition that the bank statements, tax returns, and check registers they provided allow meaningful reconstruction of their transactions, (Dkt. #13 at 12), the *Juzwiak* court found similar records submitted by the debtor in that case to be legally insufficient. 89 F.3d at 428 ("The records furnished by Juzwiak – checking account ledgers, canceled checks, bank statements, and a 1993 income tax return – do not enable Cargill to reconstruct Juzwiak's grain sale transactions or to track his financial dealings for any period of time with any degree of completeness or accuracy."). While the Feiges claim to have kept detailed business records on the computer, these records were never provided to Spoerer or the Trustee despite Spoerer's requests. (*See* CP 51, Ex. B).

Because Spoerer has raised a question regarding whether the Feiges failed to keep or preserve recorded information from which the debtor's financial condition or business transactions might be ascertained, summary judgment was improper and the issue will be remanded to the bankruptcy court.

### e. § 727(a)(4)(D): Withholding Information from an Officer of the Estate

"The court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records,

ORDER
PAGE - 17

and papers, relating to the debtor's property or financial affairs." 11 U.S.C. § 727(a)(4)(D).

Spoerer claims that the Feiges "failed to provide their full and signed tax returns for the last two years as well as a true Profit and Loss statement and other documents for their business Kritter Konnection as ordered by the Trustee." (Dkt. #12 at 29). As discussed above, the Feiges did not turn over the "extensive business records" they claimed to have kept on their computer. However, the Trustee never requested that information. Rather, the Trustee requested only two years of tax returns and a balance sheet and was satisfied with what he received. (CP 37).

Because the debtors provided all that the Trustee requested, Spoerer's § 727(a)(4)(D) claim fails and was properly dismissed. *See In re Matus*, 303 B.R. 660, 679-680 (Bankr. D. Ga. 2004) (denying claim although the Plaintiff had proved that the Debtor failed to disclose information related to his property or financial affairs with the intent to hinder the investigation of the Trustee and creditors because it failed to present evidence of specific document requests made by the Trustee).

### 3. Sanctions

Feiges argue that the bankruptcy judge abused his discretion by awarding only $7,500 in sanctions rather than the $31,723.72 claimed as the full amount of fees and costs. While this Court disagrees with the bankruptcy judge's opinion that none of Spoerer's claims have merit, it does appear that some of them were frivolous, most notably the "loading up on luxuries claim." As the Feiges noted, however, the court gave no analysis or findings as to how it arrived at its figure. (Dkt. #13 at 25). Because there is no way to determine what, if any, portion of the dollar amount awarded reflects claims that are being remanded for trial, the sanction award will be vacated for reconsideration on remand.

ORDER
PAGE - 18

### 4. Real Party in Interest

Feiges argue that sanctions should be imposed against Charles Spoerer rather than Spoerer / Burke 1 LLC as the real party in interest.  (Dkt. #13 at 27).  Feiges base their argument on records from the Secretary of State showing that Spoerer's status as a Limited Liability Company lapsed on August 31, 2004, (before sanctions were awarded in November), and remained inactive until it was administratively dissolved on December 1, 2004.  (Dkt. #18 at 6).  Spoerer was then reinstated as an LLC on April 11, 2005, the day Spoerer's opening brief was filed in this Court.  (Dkt. #18 at 6).

In support of this argument, Feiges' counsel has filed a declaration with attached documentation showing this string of events.  (Dkt. #19).  This prompted Spoerer to file a motion to strike the declaration, its attachments, and the portion of Feiges' reply brief making this argument because it addresses an issue not raised in the Issues on Appeal.  (Dkt. #20).

The motion to strike will be denied without prejudice for failure to follow Local Rule 7.  Though the issue is likely moot because any sanctions or awards will now be imposed post reinstatement of the LLC, the bankruptcy judge has the discretion whether to entertain any arguments regarding the existence of Spoerer.[4]

### 5. Costs on Appeal

Feiges ask for fees and costs pursuant to Fed. R. App. P. 38 and Bankr. R. 8014.  (Dkt. #13 at 24).  Because the judgment below will not be affirmed in its entirety, Feiges are not entitled to costs on appeal despite the frivolous nature of some of the claims.  *See* Bankr. R. 8014 ("If a judgment is affirmed or reversed in part, or is vacated, costs shall be allowed only as ordered by the court."); *Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1005 (9th Cir. 1987)

---

[4]At the sanctions hearing, Judge Steiner concluded that there was an insufficient factual basis for the awarding of sanctions against Charles Spoerer and his marital community.  (Dkt. #1, Attachment 8 at 9).  However, Feiges' documents from the Secretary of State were not part of the record.

ORDER
PAGE - 19

("Fed. R. App. P. 38 authorizes sanctions for a frivolous 'appeal,' not for a frivolous argument.").

### IV. CONCLUSION

Having reviewed the parties' briefs, and the balance of the record, the Court hereby ORDERS:

(1) The Order Granting Summary Judgment in favor of Appellees/Cross-Appellants is REVERSED on Appellant/Cross-Appellee's claims under 11 U.S.C. § 727, (except § 727(a)(4)(D), Withholding Information from an Officer of the Estate), and REMANDED to the Bankruptcy Court for a trial on the merits.

(2) The Order Granting Summary Judgment on all claims under 11 U.S.C. § 523 and § 727(a)(4)(D) is AFFIRMED.

(3) The Order Granting Sanctions awarded against Appellant/Cross-Appellee and its Counsel is VACATED and REMANDED for further consideration.

(4) Appellees/Cross-Appellants' Request for Costs and Fees on Appeal is DENIED.

(5) Appellant/Cross-Appellee's Motion to Strike is DENIED without prejudice.

(3) The Clerk shall forward a copy of this Memorandum Order to all counsel of record.


DATED this 7th day of December 2005.


RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 20